UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LINDA HASH, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | No. 1:19-cv-01157-JMS-TAB |
| | ) | |
| CITY OF GREENSBURG, | ) | |
| DAN MANUS, and | ) | |
| KATHY REYNOLDS, | ) | |
| | ) | |
| *Defendants*. | ) | |

## ORDER

Plaintiff Linda Hash filed this lawsuit against the City of Greensburg, Indiana (the "City"), former City Mayor Dan Manus, and her former supervisor Kathy Reynolds, alleging that they violated her rights under the Americans with Disabilities Act (the "ADA"), the Age Discrimination in Employment Act (the "ADEA"), the Family and Medical Leave Act (the "FMLA"), and the Employee Retirement Income Security Act ("ERISA") during her employment with the City. [Filing No. 33.] Defendants have filed a Motion for Summary Judgment, [Filing No. 37], which is now ripe for the Court's decision.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by

showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. Williams v. Brooks, 809 F.3d 936, 941-42 (7th Cir. 2016). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome-determinative. Montgomery v. Am. Airlines Inc., 626 F.3d 382, 389 (7th Cir. 2010). Fact disputes that are irrelevant to the legal question will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. Gekas v. Vasilades, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. Nelson v. Miller, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. Skiba v. Ill. Cent. R.R. Co., 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. Miller v. Gonzalez, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and

the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

The Court notes that neither parties' counsel has followed the Court's instruction on how to file and cite to exhibits, as set forth in Exhibit A the Court's Practices and Procedures. [Filing No. 4.] In particular, the exhibits—or rather, exhibit—accompanying Ms. Hash's response are contained within a single document, and that document does not number the exhibits contained within it or have a descriptive identifier. [*See* Filing No. 4 at 16.] Additionally, Ms. Hash's counsel fails in the response brief to properly cite (and often entirely fails to cite) to evidence in the record. Counsel's wholesale disregard of the Local Rules and the Undersigned's Practices and Procedures has required the Court to expend unnecessary resources and made the Court's review of the pending motion unnecessarily cumbersome. Consistent with the foregoing authority, the Court will not scour the record, and will limit its review to properly cited admissible evidence. Counsel are cautioned to comply with the Court's Practices and Procedures going forward in this and other cases.

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.  The Parties

Ms. Hash is 66 years old.  [Filing No. 49-1 at 3.]  She worked for the City from 2009 to 2019 as a planning zoning assistant.  [Filing No. 39-1 at 2-3.]  Initially, Ms. Hash's position was classified as part-time, even though she worked full-time hours.  [Filing No. 39-1 at 3.]  After approximately one year, she became a full-time employee.  [Filing No. 39-1 at 3.]  As a full-time employee, her job title did not change, but she was "able to accrue vacation and sick days" and get paid for holidays.  [Filing No. 39-1 at 3.]

Mr. Manus was Mayor of the City from 2016 through 2019.  [Filing No. 49-1 at 214.]  As Mayor, he oversaw both Ms. Hash and her supervisor, Ms. Reynolds.  [Filing No. 39-4 at 11.]

Ms. Reynolds began working for the City in September 1990 as an engineer, and she held that position until March 2012.  [Filing No. 49-1 at 133.]  Ms. Reynolds' employment was terminated in March 2012 for "budget reasons."  [Filing No. 49-1 at 134.]  She was rehired by the City in June 2017, and she worked as the building official.  [Filing No. 49-1 at 127.]  As the building official, she was Ms. Hash's immediate supervisor.  [Filing No. 39-1 at 6.]  Only one other employee—Steve Hamilton—was under the direct supervision of Ms. Reynolds.  [Filing No. 39-1 at 6.]  Mr. Hamilton was older than Ms. Hash—according to Ms. Hash, he is "knocking on eighties' (sic) door"—and that she is not aware of any instances where Ms. Reynolds formally disciplined Mr. Hamilton.  [Filing No. 39-1 at 6.]  Ms. Reynolds' employment with the City ended on January 1, 2020.  [Filing No. 49-1 at 127.]

### B.  Ms. Hash's Work

Generally, the work relationship between Ms. Hash and Ms. Reynolds was tense and often combative.  Ms. Hash felt Ms. Reynolds would "nitpick" her work and constantly criticize her.  [Filing No. 39-1 at 34-38.]  Ms. Reynolds believed that Ms. Hash frequently made mistakes

in her work.  [Filing No. 39-2 at 21.]  At times when Ms. Reynolds would discuss Ms. Hash's performance with her, Ms. Hash "would get up and walk out."  [Filing No. 39-2 at 20.]  From former Mayor Manus's perspective, Ms. Hash "took a lot of things personal.  She does not hide it well.  When you say something, she just does not, you know, she does not hold that emotion back."  [Filing No. 49-4 at 14.]  He added that Ms. Hash "just rolls her eyes . . . [and] you knew she disagreed with something."  [Filing No 49-4 at 14.]

One of Ms. Hash's duties was sending "violation letters," which were letters sent by the City to citizens requiring them to take some action to come into compliance with City codes.  [Filing No. 39-1 at 7; Filing No. 39-7 at 1.]  For example, Ms. Hash was responsible for sending letters if citizens did not mow long grass or had piles of trash in their yard.  [Filing No. 39-2 at 7; Filing No. 39-7 at 1.]  If a letter was sent to a citizen stating that grass needed to be mowed and the grass remained un-mowed by the specified date, Ms. Hash would send a work order to the City's Street and Sanitation Department.  [Filing No. 39-1 at 7; Filing No. 39-7 at 1.]  The Street and Sanitation Department then mowed the grass, put a price on the labor, and Ms. Hash would send an invoice for the labor to the citizen.  [Filing No. 39-1 at 7; Filing No. 39-7 at 1-2.]

Ms. Reynolds found that Ms. Hash frequently made mistakes in performing her duties related to the letters.  [Filing No. 39-2 at 21; Filing No. 39-2 at 23; Filing No. 39-2 at 31.]  For example, on occasion, Ms. Hash would send the wrong letters to people, would refuse to produce certified letters when asked, and would leave without completing her letters, [Filing No. 39-1 at 20; Filing No. 39-2 at 32.]  Additionally, Mark Klosterkemper, the City Street Commissioner (and the individual responsible for managing the Street and Sanitation Department), declared that "[o]ften (an estimated 25% of the time), the work orders created by Linda Hash contained errors.  For example, many times the addresses and names did not match. . . . The mistakes created by

Linda Hash in preparing the work orders created the risk of my Department performing work on incorrect properties (though that never happened, as I caught the errors), but also created a risk that citizens would get a special assessment on their property taxes if work was improperly performed at their residents (sic) and they didn't pay the corresponding bill." [Filing No. 39-7 at 2.] Mr. Klosterkemper also observed that after Ms. Hash was replaced, "the errors significantly decreased." [Filing No. 39-7 at 2.]

Similarly, Ron May, the City Engineer, wrote to Mr. Manus in 2018 and expressed his concerns and doubts regarding Ms. Hash's work performance and ability. [Filing No. 39-11.] He added that "[h]er work habits were at best inconsistent. Routine tasks such as filling out receipts generally resulted in limited information on the receipt and were often difficult to read due to her writing. When asked about things she had done she would often not know the details. She was often preoccupied with personal matters. Personal telephone calls were very common and would distract from City business. . . . In summary, after working with her for a period of time, I became aware of notable limitations in her work abilities." [Filing No. 39-11.]

Due to Ms. Hash's work issues and the ongoing tension between Ms. Hash and Ms. Reynolds, Mr. Manus looked to see if there might be other departments within the City for which Ms. Hash could work. [Filing No. 39-4 at 13.] He spoke with the "clerk treasurer" and the "water company supervisor," but "[n]either was willing to have her come work for them because of (sic) they were afraid of her mistakes that she did." [Filing No. 39-4 at 13.]

Ms. Hash believed that she carried out her duties as she was trained and instructed. [Filing No. 39-1 at 35.] She stated, "I sent letters out the way I got them. The envelopes and letters, all I did was fold them and put them in." [Filing No. 39-1 at 35.] Though she acknowledges that Ms. Reynolds required her to redo letters, she stated "it was not that I was not

following correct procedure."  [Filing No. 39-1 at 35.]   Additionally, Ms. Hash testified that

when Ms. Reynolds or Mr. Manus decided to change procedures, she went along with those

changes.  [Filing No. 39-1 at 38.]

### C.  Events in 2017

Ms. Hash testified that generally, for all of 2017—the year Ms. Reynolds returned to

work at the City—"everything was great."  [Filing No. 39-1 at 7.]  On September 25, 2017, Ms.

Reynolds recorded a Disciplinary Action, or a "write-up," related to the letters for which Ms.

Hash was responsible, as well as other violations.  [Filing No. 39-2 at 9.]  The write-up states:

*The following questions should be asked and documented:*

1.   What, when, why and where did the alleged violation occur?
     letters

2.   Who was involved?
     Linda Hash

3.   Was the violation habitual in nature or an isolated incident?
     Isolated incidents

4.   Which work rule/policy was violated?
     36.132 Appearance, 36.108 Personal Calls
     leaving without permission - Work Ethics
5.   What is the employee's overall work record for the preceding twelve months?
     3 months   missed a few days
                due mothers illness
6.   Do any mitigating circumstances exist?
     yes

7.   Was the violation a malicious act, the result of negligence, or accidental?
     negligence

8.   How serious is the violation?

9.   What precedents are there in handling similar situations?
     3 day suspension

10.  What is the employee's attitude?
     indifferent

**Progressive Discipline**
     Group II - Written reprimand

[Filing No. 39-8 at 2.]  Ms. Reynolds explained the write up as follows: On occasion, Ms. Hash

would "come in [to work] in just sweatshirts and jeans," prompting the "Appearance" citation;

that Ms. Hash would routinely take personal calls from family members and from her doctor's office on her office phone line, rather than her cell phone, prompting the "Personal Calls" citation; and that on a few occasions when Ms. Reynolds was not in the office, Ms. Hash would leave "fifteen, twenty minutes early," without informing Ms. Reynolds, prompting the "Leaving Without Permission" citation. [Filing No. 39-2 at 11-12.] Ms. Hash received a three-day suspension as a result of the write-up. [Filing No. 39-1 at 9.]

Ms. Hash disputes that she ever received a write-up in 2017, though she acknowledges that she did receive a three-day suspension. [Fling No. 39-1 at 9.] Ms. Hash never actually received the write-up, she only heard about it and its contents from other people. [Filing No. 39-1 at 9.] When Ms. Hash requested a copy of everything in her personnel file in October 2017, she saw that she had a write up from September. [Filing No. 39-1 at 10.]

**D.  Events in 2018**

From May 22 to May 24, 2018, Ms. Hash exchanged emails with Melanie Maxwell, a coworker. [Filing No. 39-9 at 2-3.] In the emails, Ms. Maxwell expressed concern and stated that she saw things slipping through that Ms. Hash would have caught in the past. [Filing No. 39-9 at 3.] Ms. Hash responded that Ms. Reynolds had made her job much more difficult and that she was mad at Ms. Reynolds. [Filing No. 39-9 at 3.] Ms. Hash also told Ms. Maxwell that she was stressed and stated, "I have seen my doctor and she said I look like s**t and gave me some orders and upped my meds." [Filing No. 39-9 at 2.] Ms. Maxwell replied that Ms. Hash's work was affected in ways that she had not observed before, and that the City was changing some of the forms and procedures to make it easier for Ms. Hash. [Filing No. 39-9 at 2.]

On May 24, as Ms. Hash was about to leave for the day, Ms. Reynolds called Ms. Hash to her desk. [Filing No. 39-9 at 1.] Ms. Reynolds told Ms. Hash that she and Ms. Maxwell had

8

been talking, and they felt that Ms. Hash was on the edge of a nervous breakdown and looked pale.  [Filing No. 39-9 at 1.]  According to Ms. Hash's notes, Ms. Reynolds also stated that "the whole building was worried and talking about me and one person asked if I had dementia."

[Filing No. 39-9 at 1.]  In her deposition, Ms. Hash testified slightly differently, stating:

> She said, I know it's on your mind, she said, but Melanie and I are really worried that you have dementia because everybody is noticing it.  I said, Everybody?  She said, Everybody.  Well, I didn't see everybody at City Hall, so that was a lie.  I go, Dementia?  She goes, Yeah, we think you got dementia.  I was offended.  Very much offended because that is what my mother has. That really upset me.

[Filing No. 39-1 at 13.][1]   In her deposition, Ms. Reynolds recounted her version of the conversation, testifying:

> I asked her if she had a moment.  I said, I'm talking to you as your friend, not your boss.  As a friend, because I consider you a friend.  I don't know if you consider me your friend, but I consider you my friend.
> 
> She said, I consider you a friend.  I said, There are a few of us that are worried about you because your work has gone down.  We know you have a lot on your plate with your mother.  I get that your mother is ill.  I get that your mother has dementia because my mother had dementia.  I know what you are going through.
> 
> I also stated to her that we were worried about her because she was being very forgetful.  I said someone spoke out and said, I hope, you know, the way Linda is acting it seemed like she is on the verge of maybe early stages of Alzheimer's.  I just said, I worry about you and hope for your well-being because, again, you have a lot on your plate with your mother.  You do a lot for your grandkids.  I just worry about you, yourself, and your husband.

[Filing No. 39-2 at 15.]  When asked directly "But you did say to her that, [a]re you suffering from Alzheimer's?" Ms. Reynolds testified "No, sir."  [Filing No. 39-2 at 15.]

A few weeks later, on June 8, 2018, Ms. Hash informed Ms. Reynolds that she needed to leave five hours early because her aunt had died in Muncie.  [Filing No. 39-5 at 1.]  Ms. Hash testified that Ms. Reynolds told her she didn't have any time to take off, to which Ms. Hash

---

[1] The Court must draw all reasonable inferences in Ms. Hash's favor.  However, applying that standard is more difficult due to Ms. Hash's changing version of events regarding the context of the dementia comment.  [*Compare* Filing No. 39-1 at 13 *with* Filing No. 39-9 at 1.]

responded, "you have to be kidding me."  [Filing No. 39-1 at 18.]  As Ms. Hash walked to the door, Ms. Reynolds said, "You don't have any F***ing hours and I didn't approve your F***ing overtime."  [Filing No. 39-5 at 1.]  Ms. Hash responded that Ms. Reynolds could "shove that five hours up your f***ing a**."  [Filing No. 39-1 at 18.]  Ms. Reynolds then pursued her down the hallway, stating that she had every right to follow Ms. Hash.  [Filing No. 39-1 at 18.]  When Ms. Hash headed toward the restroom, she stated, "are you going to go in the stall with me too?," at which point Ms. Reynolds stopped following her, but stated "[n]o, Linda. You are a big girl.  I don't need to hold your hand."  [Filing No. 39-2 at 20.]

Mr. Manus heard the commotion outside of his office.  [Filing No. 39-4 at 7.]  After Ms. Hash exited the restroom, she and then-Mayor Manus spoke about the incident.  [Filing No. 39-5 at 1.]  After Ms. Hash she explained the situation, he approved her five hours to travel to Muncie that day, but stated that he had to write her up for a 3-day suspension for her language.  [Filing No. 39-5 at 1.]  Ms. Reynolds was also written up, but was not otherwise punished for the incident.  [Filing No. 39-4 at 7-8.]

Sometime in June or July 2018, Ms. Hash fell and broke her hip.  [Filing No. 39-1 at 24; Filing No. 39-23 at 5.]  Sometime later, Ms. Hash had hip replacement surgery.[2]  [Filing No. 39-12 at 1; Filing No. 39-1 at 24.]  Shortly after the surgery—either the day of the surgery or the following day—Ms. Reynolds called Ms. Hash and spoke to either Ms. Hash or her daughter.  [Filing No. 39-1 at 24-25 (Ms. Hash testifying that Ms. Reynolds spoke to Ms. Hash's daughter);

---

[2] In a telling example of the lack of specificity in the briefing, the date Ms. Hash had her surgery is entirely unclear from the record.  Ms. Hash testified that she only had one surgery, that the doctor's note on her FMLA leave certification form, that she would require two surgeries was incorrect, [Filing No. 49-1 at 100], and that the surgery was performed the day after she broke her hip, [Filing No. 39-1 at 24].  However, medical records indicate that her surgery was scheduled for September 25, several months after her fall.  [Filing No. 39-12 at 1.]

Filing No. 39-2 at 17-18 (Ms. Reynolds testifying that she spoke to Ms. Hash).]  During the phone conversation, Ms. Reynolds asked when Ms. Hash would return to work, but Ms. Hash was not sure.  [Filing No. 39-1 at 24-25; Filing No. 39-2 at 18.]  Ms. Reynolds did not say that Ms. Hash needed to return to work by a particular date.  [Filing No. 39-1 at 25.]

Following her injury and surgery, Ms. Hash was on FMLA leave beginning on September 1, 2018, [Filing No. 49-1 at 101], and she was fully cleared to return to work on October 29, 2018, [Filing No. 39-1 at 26 ("Q: So you were cleared to fully return to work in October? A: Uh-huh."); Filing No. 39-15 at 1 (Physician's Assistant note stating that Ms. Hash could return to work on October 29, 2018)]. While Ms. Hash was out on FMLA leave, other City employees assisted Ms. Reynolds in performing Ms. Hash's duties.  [Filing No. 39-14 at 1.]  During that time, those employees "reported numerous errors in Linda Hash's work" to Ms. Reynolds.  [Filing No. 39-14 at 1.]  Ms. Reynolds took steps to improve those deficiencies, including counseling Ms. Hash on those deficiencies.  [Filing No. 39-14 at 1.]  However, Ms. Hash was not formally disciplined or reprimanded upon her return from FMLA leave.  [Filing No. 39-14 at 1.]  Instead, Ms. Reynolds created new procedures and a checklist for Ms. Hash to follow in handling the grass and junk letters.  [Filing No. 39-14 at 2.]

Shortly after Ms. Hash was cleared to return to work, Ms. Reynolds told Ms. Hash "to go to the post office to get some certified mail stuff."  [Filing No. 39-1 at 26.]  Usually, Ms. Reynolds went to the post office, but Ms. Hash had gone several times in the past.  [Filing No. 39-1 at 26.]  On this occasion, Ms. Hash objected because "[o]ur post office has itty bitty steps and a lot of them to get up there.  I could not do steps."  [Filing No. 39-1 at 26.]  Ms. Reynolds responded that Ms. Hash's work release form did not say anything about steps.  [Filing No. 39-1 at 26.]  Ms. Hash testified that she did not ask for her inability to handle stairs to be included in

her work release because City Hall does not have steps.  [Filing No. 39-1 at 26.]  Ultimately, Ms. Reynolds went to the post office instead of Ms. Hash, but she did require that Ms. Hash get a new work release that stated she was unable to go up or down stairs.  [Filing No. 39-1 at 26; Filing No. 39-16 at 1 (physician's note dated November 6, 2018 stating that Ms. Hash is "unable to walk up or down a flight of stairs for 6 weeks").]  Ms. Reynolds did not ask Ms. Hash to go to the post office or otherwise use stairs while Ms. Hash was under the restriction.  [Filing No. 39-1 at 27.]

On December 6, 2018, Ms. Hash sent a memo to the City stating that she "will be vested November 21st of 2019, and will retire shortly thereafter."  [Filing No. 49-1 at 107.]

**E.  Events in 2019**

On January 4, 2019, Ms. Hash received a verbal review regarding some of her job duties.  [Filing No. 39-5 at 1; Filing No. 39-17.]  During the review, Ms. Hash was told she needed to improve.  [Filing No. 39-5 at 1; Filing No. 39-17.]  In particular, the review centered on: tardiness and absences, dishonesty and insubordination, neglect of performance of assigned duties, and failure to report.  [Filing No. 39-1 at 27; Filing No. 39-17.]  Ms. Hash had begun compiling notes about her work situation, and noted at the time that she "had a 'review' regarding messing up addresses on [Ms. Reynolds'] mailings."  [Filing No. 39-5 at 1.]  She also noted that at her January 4, 2019 review, she told Ms. Reynolds that she knew Ms. Reynolds was trying to get her fired.  [Filing No. 39-5 at 1.]  Ms. Hash did not believe that the mistakes and errors that prompted the review were not her fault.  [Filing No. 39-1 at 27-29.]

On January 9, 2019, the City clerk's office received a complaint from Ms. Hash concerning the work environment.  [Filing No. 39-13.]  In the three-page complaint, Ms. Hash stated that she had "not felt welcome since Kathy [Reynolds] has returned. . . . She comes back

12

and I get 2 write ups and 1 review.  She keeps saying I am not doing things right, but I continue to do things the way she trained me when she was here before." [Filing No. 39-13 at 1.] The rest of Ms. Hash's January 9, 2019 complaint recounts several instances where she and Ms. Reynolds had disagreements or where she felt Ms. Reynolds was being overly harsh or unfair to her, many of which are described above. [Filing No. 39-13.] Notably, in her January 9, 2019 complaint, Ms. Hash did not mention or claim that Ms. Reynolds was discriminating against her on the basis of her age, her use of FMLA leave, or her alleged disability. [Filing No. 39-13.] Ms. Hash concluded her complaint by acknowledging that she had recently informed the City that she planned to retire at the end of 2019, hoping that doing so would get Ms. Reynolds to leave her alone. [Filing No. 39-13 at 3.]

By January 25, 2019, Ms. Hash had retained counsel. Her attorney sent a letter to the City and Mr. Manus "to complain that Ms. Hash has been the victim of overt age, disability and FMLA discrimination by her direct supervisor, Ms. Kathy Reynolds." [Filing No. 39-19 at 1.] The letter proceeds to articulate specific examples of purported discrimination, stating:

- Asking Ms. Hash if she has Alzheimer's, for absolutely no reason;

- Cursing at Ms. Hash with the f word in a mean fashion;

- Writing up Ms. Hash for mistakes that Ms. Reynolds made, such as inaccurately addressing envelopes;

- Calling Ms. Hash while she lay in the hospital immediately after hip replacement surgery and demanding to know when Ms. Hash planned to be back at work;

- Demanding that Ms. Hash deliver items to the post office immediately after hip replacement surgery, knowing that Ms. Hash could not navigate the stairs, and then demanding a doctor's note to that effect, even when her condition was obvious;

- Disciplining Ms. Hash for false allegations of dishonesty, insubordination, neglect of performance of assigned duties, and failure to report;

13

- Failing to recognize Ms. Hash's comp time.

[Filing No. 39-19 at 1.]  The letter further alleges that Ms. Reynolds does not treat younger, healthier employees in the same way, that Ms. Reynolds has retaliated against Ms. Hash for taking legitimate FMLA leave, and that Ms. Reynolds has discriminated against Ms. Hash because of her age.  [Filing No. 39-19 at 1.]  The letter concludes that Ms. Hash intends to file a charge with the Equal Opportunity Employment Commission against the City and Ms. Reynolds and demands that the City stop the harassment immediately.  [Filing No. 39-19 at 1.]

On March 1, 2019, Ms. Hash failed to report to work.  [Filing No. 39-1 at 34.]  She testified that she left the request form on Ms. Reynolds' desk and that Ms. Reynolds told her she could have the day off.  [Filing No. 39-1 at 34.]  Ms. Hash added that normally Ms. Reynolds signs the forms, but on this occasion, she did not.  [Filing No. 39-1 at 34.]  Mr. Manus testified that it was standard protocol for either him or Ms. Reynolds to sign off on requests for time off. [Filing No. 39-4 at 15.]

### F.  Other Actions by Ms. Reynolds

Generally, Ms. Hash believes that Ms. Reynolds made comments that made her feel that Ms. Reynolds did not like her or was discriminating against her because of her disability and age. [Filing No. 39-1 at 31.][3]  Ms. Hash testified that Ms. Reynolds asked multiple times whether Ms. Hash was old enough to draw social security and how old she was.  [Filing No. 39-1 at 31.]  She also testified that Ms. Reynolds would rudely ask whether her hip was still hurting, and whether she was still having trouble with her hip.  [Filing No. 39-1 at 31.]  Similarly, Ms. Hash stated in her affidavit that Ms. Reynolds asked "at least three times" when Ms. Hash was going to retire.

---

[3] The parties do not provide the Court with any sort of timeline that shows when these comments were made.

[Filing No. 49-1 at 246.]  Ms. Hash also stated that Ms. Reynolds frequently made statements referencing Ms. Hash's FMLA leave, such as asking why she took FMLA leave and whether she really needed it.  [Filing No. 39-1 at 32.]  However, Ms. Hash testified that she never saw Ms. Reynolds discriminate against anyone else on the basis of age, disability, or for taking FMLA leave.  [Filing No. 39-1 at 33.]

Ms. Hash does not claim that Mr. Manus made any such comments.  [Filing No. 39-1 at 32.]  Indeed, when asked whether Mr. Manus "ever [said] anything or [did] anything that made you feel like he wanted to fire you or was discriminating against you on the basis of your age, disability, or taking FMLA leave," Ms. Hash testified "Not really, no."  [Filing No. 39-1 at 32.]

**G.  Ms. Hash's Termination**

On March 4, 2019, the City terminated Ms. Hash's employment.  [Filing No. 39-20.]  On that day, Ms. Reynolds and Ron May—one of Ms. Hash's former supervisors, [Filing No. 39-3]—met with Ms. Hash, [Filing No. 39-1 at 32].  During the meeting, Mr. May read a letter to Ms. Hash informing her of her termination, which stated in relevant part:

> Despite efforts by the Engineer's Office and Building Official Office to improve your work performance, you have failed to correct behavior and actions that conflict with direct orders and continue to make mistakes in your work.  These are violations of the City of Greensburg Personnel Policies Handbook, *Section 6.13 Employee Conduct*, including Group 1, #8 Unauthorized use of telephone or mail for personal use; #10 Unsatisfactory work or failure to maintain required standard of performance; Group III, #2 Neglect in the performance of assigned duties; Group III, #15 Insubordination by refusing to perform assigned work or to comply with written or verbal instructions of the supervisor.
>
> On March 1, 2019 another violation occurred by failing to report to work without prior authorization[.]
>
> We were hopeful that you would have corrected your work deficiencies, but this has not happened.  This has been an ongoing pattern of behavior and you have been unwilling or unable to correct your deficiencies.

[Filing No. 39-20.]  Ms. Hash responded to Ms. Reynolds by saying "do you really hate me that bad?"  [Filing No. 39-1 at 32.]  Ms. Hash left the meeting and went to speak with Mr. Manus.  [Filing No. 39-1.]  She testified that Mr. Manus said that the decision was Ms. Reynolds'.  [Filing No. 39-1 at 33.]  Mr. Manus later testified, however, that he instructed Ms. Reynolds to fire Ms. Hash because everything was in constant turmoil and he "just didn't feel [Ms. Hash] was doing the job, was not doing the right job."  [Filing No. 39-4 at 11.]  He added that Ms. Hash's absence on March 1, 2019 without his or Ms. Reynolds signature was "[t]he last little bit, . . . the straw that[?] broke the back."  [Filing No. 39-4 at 12.]

Following Ms. Hash's termination, the City filled her position with Tracey Davis, "who was 60 or 61 at the time."  [Filing No. 39-7 at 2.]

### H.  The Lawsuit

On March 2, 2020, Ms. Hash filed her Amended Complaint, the operative complaint in this matter.  [Filing No. 33.]  In her Amended Complaint, Ms. Hash sets forth claims under the FMLA, the ADA, the ADEA, and ERISA.  [Filing No. 33.]  Defendants have filed a Motion for Summary Judgment, [Filing No. 37], which is now ripe for the Court's decision.

### III.
### DISCUSSION

### A.  Individual Liability

Defendants argue that Ms. Hash's claims against Ms. Reynolds and Mr. Manus under the ADEA and ADA should be dismissed because "[t]here is no individual or supervisor liability under the ADEA or ADA."  [Filing No. 38 at 22 (citing *U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1282 (7th Cir. 1995)).]

Ms. Hash concedes "that there is no individual liability under the ADEA or ADA."  [Filing No. 49 at 16.]  Because the parties agree that there is no individual liability under the

ADEA and ADA.  the Court **GRANTS** Defendants' Motion for Summary Judgment on Ms. Hash's ADA and ADEA claims against Ms. Reynolds and Mr. Manus.

### B.  ADEA Claims Against the City

#### 1. *Discrimination*

Defendants argue that the City is entitled to summary judgment on Ms. Hash's ADEA discrimination/wrongful termination claim because the statements that form the basis of the claim do not rise to the level of discrimination.  They argue that Ms. Reynolds asking whether Ms. Hash was old enough to draw social security is not direct evidence of age discrimination, and the conversation about Alzheimer's did not relate to age discrimination because "it was an expression of genuine concern based on health symptoms and stress Plaintiff acknowledged she was experiencing and was unable to separate from work at the time." [Filing No. 38 at 23-24.] Additionally, Defendants argue that Ms. Hash cannot make a *prima facie* showing that she was performing according to the City's legitimate expectations, nor can she "make a showing that similarly situated, substantially younger employees were treated more favorably." [Filing No. 38 at 24-25.]  They argue that Ms. Reynolds and Mr. Manus received numerous complaints about Ms. Hash from other City employees and from the public, and that she also had multiple disagreements with her supervisors.  [Filing No. 38 at 24.]  They also argue that the only other similarly situated employee, who Ms. Hash claims was "treated better," was actually older than Ms. Hash.  [Filing No. 38 at 25.]

Ms. Hash responds that Defendants discriminated against her because of her age, and that she would not have been terminated if she was less than forty years old.  [Filing No. 49 at 6 (citing *Achor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1994)).]  She argues that Ms. Reynolds "mistreated Plaintiff continually throughout" her employment, including "ask[ing]

Plaintiff if she had Alzheimer's, whether Plaintiff thought she was old enough to receive social security retirement, and repeatedly ask[ing] plaintiff when she was going to retire." [Filing No. 49 at 6 (citations omitted).] She maintains that the idea that such comments do not indicate age discrimination is "absurd." [Filing No. 49 at 7.] She concludes that "[a] jury should decide if Ms. Hash was terminated due to her age." [Filing No. 49 at 7.]

Defendants reply that Ms. Hash's age was not the but-for cause of her termination. [Filing No. 50 at 1.] They argue that she failed to cite evidence that similarly situated comparators outside her protected class were treated more favorably, and therefore her age discrimination claim fails under the indirect method. [Filing No. 50 at 2.] Turning to the direct method, Defendants argue that "it would be completely unreasonable for any juror to conclude Plaintiff would not have been terminated if she were less than forty years old." [Filing No. 50 at 2 (citing *Achor*, 117 F.3d at 341).] In support of their argument, Defendants point out that Mr. Manus—the decision maker—was older than Ms. Hash; that Ms. Reynolds was in her mid-fifties and the only other employee Ms. Reynolds supervised and whom Ms. Hash testified was treated better than her, was nearly ten years older than Ms. Hash; that the City employs several individuals older than Ms. Hash; and that Ms. Hash's replacement was a woman in her sixties.[4] [Filing No. 50 at 2-3.] Defendants also reply that the questions about Ms. Hash's retirement plans came after Ms. Hash notified the City and Ms. Reynolds that she intended to retire in November 2019. [Filing No. 50 at 4.] Therefore, they argue, those "stray remarks," taken in context, do "not support an inference of discrimination as a matter of law." [Filing No. 50 at 4.] Similarly, they argue that the context of the Alzheimer's comment—specifically that the mention occurred ten months prior to Ms. Hash's termination and in response to Ms. Hash's own

---

[4] Defendants fail to cite to evidence in support of these assertions.

statements—"is not direct evidence to support an inference of age discrimination."  [Filing No. 50 at 5-6.]

The ADEA makes it illegal for an employer "to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); s*ee also Van Antwerp v. City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010) (citing *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641 (7th Cir. 2008)).  To establish a discrimination claim under the ADEA, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).  Mixed motive claims are not available under the ADEA.  *Id.*; *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020).  Put differently, "it's not enough to show that age was *a* motivating factor.  The plaintiff must prove that, but for [her] age, the adverse action would not have occurred." *Martino v. MCI Communications Servs., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009).

As a general proposition, "the singular question that matters in a discrimination case is: Whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (applying standard in ADEA case) (quoting *Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 894 (7th Cir. 2018); *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

In adopting the singular question, *Ortiz* dispensed with the old "direct- and indirect-framework" as it relates to the "proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect.'" 834 F.3d at 766.  However, the Seventh Circuit has not entirely

done away with separate tests or methods to analyze discrimination cases, and it has stated that "the well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson*, 892 F.3d at 894; *McDaniel*, 940 F.3d at 368.

Under the *McDonnell Douglas* framework, "the plaintiff must show evidence that '(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 720 (7th Cir. 2018) (applying the *McDonnell Douglas* framework in the ADEA context) (quoting *Carson v. Lake Cty.*, 865 F.3d 526, 533 (7th Cir. 2017)). "If the plaintiff meets each element of her prima facie case, 'the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Id.* at 719–20 (quoting *Carson*, 865 F.3d at 533).

Turning first to the *McDonnell Douglas* framework, Ms. Hash satisfies the first element because she is over forty years old and is therefore a member of the ADEA protected class. Similarly, there is no dispute that Ms. Hash suffered an adverse employment action when she was terminated, satisfying the third element. The parties disagree, however, on whether Ms. Hash was meeting the City's legitimate expectations.

Under the *McDonnell Douglas* framework, Ms. Hash bears the burden to present sufficient evidence to show that she was meeting the City's legitimate job expectations. *Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 666 (7th Cir. 2008). "A determination that an individual is performing a job well enough to meet an employer's legitimate expectations, when made in the

20

context of a prima facie case, may be based solely upon the employee's testimony concerning the quality of [her] work." *Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 923 n.6 (7th Cir. 1988) (citing *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 512 (7th Cir. 1986)).  Ms. Hash testified that her work met the City's expectations, and that she was not responsible for any mistakes.  [Filing No. 39-1 at 8; Filing No. 39-1 at 34-39.]  Therefore, Ms. Hash has met her burden of establishing the third element of a prima facie case.  *See Weihaupt v. American Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989).

With respect to the fourth element, "[a]lthough similarly situated individuals need not be identical in every conceivable way, they must be directly comparable to the plaintiff in all material respects." *Sweatt v. Union Pacific R.R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015) (internal quotation marks omitted).  The Supreme Court has held that "the ADEA prohibits discrimination on the basis of age and not class membership." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996).  "The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as [she] has lost out *because of [her] age*." *Id.* at 312 (emphasis in original).  Ms. Hash's replacement was younger than her.  Though her replacement was herself "60 or 61 at the time," [Filing No. 39-7 at 2], Ms. Hash has satisfied the fourth element and has stated a prima facie case for age discrimination.  *See Grohs v. Gold Bond Bldg. Prods.*, 859 F.2d 1283, 1286 (7th Cir. 1988); *Oxman v. WLS-TV*, 846 F.2d 448, 453 (7th Cir. 1988).

Because Ms. Hash satisfied her initial requirement of establishing a prima facie case, the burden shifts to Defendants "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Skiba*, 884 F.3d at 720.  Defendants argue that Ms. Hash was terminated because of "constant turmoil she caused and lack of improvement" in her work.  [Filing No. 38 at

25 (internal quotation marks omitted).]  Accordingly, "the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.*

Ms. Hash argues that she was terminated "for the pretextual reason that she had taken a day off without leave." [Filing No. 49 at 15.]  Perplexingly, Ms. Hash fails entirely to address the reason set forth in Defendants' brief: "the City terminated [Ms. Hash] for a legitimate, non-discriminatory reason – namely (and in the words of the decision-maker), the 'constant turmoil' she caused and lack of improvement despite 'all of the processes all of the way through the two and a half years of trying.'"  [Filing No. 38 at 25.]  Ms. Hash appears to focus solely on one sentence of the termination letter that states that Ms. Hash violated the City's Personnel Policies Handbook when she was absent from work on March 1, 2019.  [Filing No. 39-11.]  In addition to failing to address Defendants' purported legitimate, nondiscriminatory explanation, Ms. Hash fails to cite to any evidence that might satisfy her burden of showing that Defendants' purported reason was pretextual or that her work was improving (or, alternatively, did not need improving).[5]  Though she testified that she performed the work as she was instructed, "[a]n

---

[5] Indeed, the record contains voluminous evidence supporting Defendants' nondiscriminatory explanation, including that she was not adequately performing her work and that multiple departments within the City found Ms. Hash difficult to work with.  [*See, e.g.*, Filing No. 39-11; Filing No. 39-14 at 2.]  Mr. Manus testified that at least two other divisions within the City government did not want Ms. Hash to "work for them because . . . they were afraid of her mistakes."  [Filing No. 39-4 at 13.]  Ms. Hash does not appear to deny that the mistakes were made, but instead blames them on Ms. Reynolds.  [Filing No. 39-1 at 7; Filing No. 39-1 at 11; Filing No. 39-1 at 17-18.]  Ms. Hash was also suspended for three days on at least two separate occasions.  [Filing No. 39-8; Filing No. 39-1 at 18.]

Additionally, Ms. Hash's former supervisor, Mr. May, wrote to Mr. Manus in 2018 and explained that Ms. Hash could not be relied upon to perform her work correctly.  [Filing No. 39-11.]  He added that "[h]er work habits were at best inconsistent.  Routine tasks such as filling out receipts generally resulted in limited information on the receipt and were often difficult to read due to her writing.  When asked about things she had done she would often not know the details.  She was often preoccupied with personal matters.  Personal telephone calls were very common and would distract from City business. . . . In summary, after working with her for a period of time, I became aware of notable limitations in her work abilities."  [Filing No. 39-11.]  Thus, in

employee's self-serving statements about [her] ability, however, are insufficient to contradict an employer's negative assessment of that ability.  Such statements may create a material dispute about the employee's ability but do nothing to create a dispute about the employer's honesty—do nothing, in other words, to establish that the proffered reason is a pretext for discrimination." *Gustovich v. AT&T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) (internal citations omitted); *Weihaupt,* 874 F.2d at  428 (Plaintiff "must do more than challenge the judgment of [her] superiors through [her] own self-interested assertions. The employee's perception of [herself] is not relevant.  It is the perception of the decision maker which is relevant." (internal quotations and alterations omitted)).   Ms. Hash does not point to any evidence that she had recently received positive performance reviews, that Mr. Manus believed she was performing adequately, or anything else that would contradict Ms. Reynolds' and Mr. Manus' assessment of her work.  Ms. Hash likewise fails to point to any evidence that Ms. Reynolds' or Mr. Manus' assessments were disingenuous or illegitimate. *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001) ("[W]e do not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination.…  On the issue of pretext, our only concern is the honesty of the employer's explanation.") (internal alterations and quotations omitted)); *see also Daza v. State*, 331 F. Supp. 3d 810, 847 (S.D. Ind. 2018) ("The Court will not second-guess [the supervisor's] decision to terminate [the plaintiff] based on behavior he found unacceptable, absent any evidence

---

addition to her issues with Ms. Reynolds, at least three other divisions within the City expressed to the Mayor their belief that Ms. Hash was unable to perform her work adequately.  [Filing No. 39-4 at 13 (Mr. Manus testifying that neither the "clerk treasurer" nor the "water company supervisor" were willing to have Ms. Hash work for them because of her mistakes); Filing No. 39-11 (Mr. May, the City Engineer, writing to Mr. Manus that Ms. Hash could not (or would not) complete tasks consistently or correctly, if she completed them at all, during her time with Planning, Zoning, and Historic Preservation operations).]

whatsoever that Defendants did not believe those reasons were legitimate.").   Therefore, Ms. Hash has not met her burden to submit evidence showing that the City's explanation is pretextual.

Turning to the *Ortiz* holistic approach, viewing the evidence as a whole, Ms. Hash has not presented evidence that would permit a reasonable factfinder to conclude that but for her age she would not have been fired.   Ms. Reynolds' comments about dementia and questions about social security and retirement plans within the context they were made are insufficient to permit a reasonable fact finder to conclude that Ms. Hash's age caused her discharge.   Though comments like those articulated above can be circumstantial evidence that support an inference of discrimination, the evidence as a whole does not support such an inference in this case.   Ms. Hash herself initially raised the topic of retirement when she informed the City that she intended to retire at the end of the year.   [Filing No. 39-13 at 3.]   Therefore, Ms. Hash's supervisor inquiring about her retirement plans and social security do not create an inference of discrimination.   *See Kaniff v. Allstate Ins. Co.*, 121 F.3d 258, 263 (7th Cir. 1997) (comments to an employee about retirement did not give rise to inference of discrimination).   Similarly, a singular comment about dementia, ten months before Ms. Hash's termination and at least partially in response to emails from Ms. Hash regarding her own health, does not support a reasonable inference that Ms. Hash was terminated because of her age.

Furthermore, other evidence indicates that Ms. Hash's age was not the cause of her termination.   For example, Ms. Hash testified that Ms. Reynolds never wrote up or formally disciplined the only other employee Ms. Reynolds supervised and who was older than Ms. Hash. [Filing No. 39-1 at 7.]   Ms. Hash also testified that Mr. Manus—the person who made the

decision to terminate her employment, [Filing No. 39-4 at 11]—did not discriminate against her on the basis of her age, [Filing No. 39-1 at 32].

In sum, Ms. Hash's ADEA claim fails under both the *McDonnell Douglas* framework and the *Ortiz* holistic framework.  Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment on Ms. Hash's ADEA discrimination claim against the City.

### 2. Retaliation

Defendants contend that Ms. Hash's retaliation claim under the ADEA should also be dismissed because she cannot show that she engaged in a statutorily protected activity.  [Filing No. 38 at 25.]  They argue that her "opposition to alleged 'age discrimination' was objectively unreasonable," and therefore the January 25, 2019 letter from her attorney was not protected activity.  [Filing No. 38 at 26.]

Ms. Hash responds that Defendants retaliated against her "for asserting her protected rights, both personally and through her attorney."  [Filing No. 49 at 13.]  She argues that the alleged violations contained within the termination letter "were false and made up prior disciplines," and that the real reason for her termination was Ms. Hash's complaints regarding the discrimination she had suffered.  [Filing No. 49 at 13-15.]

Defendants reply that Ms. Hash did not engage in protected activity under the ADEA, and therefore her claim should be dismissed.  [Filing No. 50 at 9.]  They argue that her complaints did not amount to protected activity because she did not have a reasonable and good faith belief that she was being discriminated against.  [Filing No. 50 at 9.]  They further argue that even if Ms. Hash engaged in protected conduct, such conduct was not the but-for cause of her termination.  [Filing No. 50 at 10.]  Defendants contend that Ms. Hash was absent from work without the required written approval in between her complaints and termination, rendering her

suspicious timing argument meritless.  [Filing No. 50 at 11 (citing *Turner v. The Saloon, Ltd*, 595 F.3d 679, 687 (7th Cir. 2010)).]  Defendants conclude that, in any event, Ms. Hash testified that Mr. Manus—the decision maker—never discriminated against her.  [Filing No. 50 at 12.]

To prove a retaliation claim under the ADEA, a plaintiff must prove: "(1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two.  *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 464 (7th Cir. 2016) (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)).  As with a discrimination claim, in the retaliation context, the Court must determine "'whether the evidence would permit a reasonable factfinder to conclude' that the plaintiff's age 'caused the discharge or other adverse employment action.'"  *McDaniel*, 940 F.3d at 370 (quoting *Ortiz,* 834 F.3d at 765).  The *McDonnell Douglas* framework is likewise available in retaliation cases.  *McDaniel*, 940 F.3d at 370 (applying standard in ADEA retaliation context).  "Under the *McDonnell Douglas* framework in the retaliation context, 'a plaintiff must show that (1) [she] engaged in protected activity; (2) [she] suffered a materially adverse employment action; (3) [she] was meeting [her] employer's legitimate expectations; and (4) [she] was treated less favorably than similarly-situated employees who did not engage in protected activity.'"  *Id.* (quoting *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016)).

Turning first to the *McDonnell Douglas* framework, Ms. Hash satisfies the second and third elements for the same reasons articulated above.  Ms. Hash argues that she engaged in protected conduct by complaining to the City about age discrimination in her January 9, 2019 letter to the City clerk's office, [Filing No. 39-13], and via her attorney's January 25, 2019 letter to the City and Mr. Manus, [Filing No. 39-19].  However, Ms. Hash's January 9, 2019 letter makes no mention of age or age discrimination, and therefore cannot constitute ADEA protected

26

activity. *Tomanovich*, 457 F.3d at 663 ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.").

Ms. Hash's attorney's letter is also not protected conduct because the evidence shows that she did not have a reasonable and good faith belief that she was being discriminated against because of her age. Ms. Hash "need not show that the practice she opposed was a violation of the ADEA; she may be mistaken and still claim protection. However, her opposition must be based on a good faith and reasonable belief that she is opposing unlawful conduct." *Schroeder v. Shawano Cty.*, 870 F. Supp. 2d 622, 631-32 (E.D. Wis. 2012) (citing *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 632 (7th Cir. 2011)).

When asked what made her decide to hire an attorney, Ms. Hash testified: "Because I thought I was going to be fired. Everything was pointing to I could not do anything right. She was writing me up left and right. I just, or she was telling me that is wrong, you know. I didn't feel comfortable. I thought something was going to happen and it did." [Filing No. 39-1 at 31.] When asked what made her feel as if she was being discriminated against on the basis of her age at the time of the letter, Ms. Hash testified: "Just the way [Ms. Reynolds] treated me. She didn't treat anyone else that way. You know, it was like if you are doing something wrong you go, hey, can we talk, you know. This here needs to be, you know, can you fix that? No. She would make a big deal about it. It was not my mistake. It was her mistake. Stuff like that. She never ever wrote anyone up ever." [Filing No. 39-1 at 31.] She later testified that she felt she was being personally targeted by Ms. Reynolds and that she was being treated this way because Ms. Hash had "put that memo out telling everyone [she] was going to retire." [Filing No. 39-1 at 31.]

In essence, Ms. Hash's stated basis for her belief that she was being discriminated on the basis of her age was that her supervisor was only criticizing her and not the other employee who was older than Ms. Hash.  Despite Ms. Hash's assertion to the contrary, the fact that Ms. Reynolds did not treat other, older employees the same way she treated Ms. Hash is evidence that Ms. Reynolds was *not* discriminating against Ms. Hash because of her age.  [Filing No. 39-1 at 6.]  Ms. Hash's arguments and testimony describe a situation where her supervisor was personally targeting her and nitpicking her.  However, the ADEA does not prohibit supervisors from personally targeting or holding personal grudges against their subordinates unless they do so because of the subordinate employee's age.

Even if Ms. Hash's attorney's letter were protected conduct,[6] Ms. Hash fails to present evidence that Defendants' purported nondiscriminatory reason for her termination was pretextual.  As noted above, she fails to address Defendants' articulated reason, [Filing No. 38 at 25], instead focusing on one sentence of the termination letter, [Filing No. 39-20].  Thus, even if Ms. Hash's attorney's letter was protected conduct, she fails to satisfy her burden under the *McDonnell Douglas* framework.

Under the *Ortiz* framework, Ms. Hash fails to present evidence of a causal connection between her protected conduct and her termination.  Ms. Hash argues that a few weeks after her attorney's letter, "Defendants fired Ms. Hash," and the "termination was in retaliation for Ms. Hash complaining about the discrimination perpetrated against her by the City of Greensburg." [Filing No. 49 at 15-16.]  Other than the length of time between Ms. Hash's attorney's letter and her termination, Ms. Hash does not identify any evidence of a causal connection between the

---

[6] If Ms. Hash's attorney's letter is protected conduct, she also satisfies the fourth element.  Mr. Hamilton—the other, older employee—did not complain about age discrimination, and his employment was not terminated.

two.  But, "suspicious timing alone 'will rarely be sufficient to create a triable issue.'" *Silk v. Bd. of Trs.*, 795 F.3d 698, 710 (7th Cir. 2015) (quoting *Argyropoulos v. City of Alton,* 539 F.3d 724, 734 (7th Cir. 2008)) (alterations omitted) (holding that the plaintiff being fired "a few weeks" after a complaint of discrimination was insufficient); *Burks v. Wisconsin Dept. of Trans.,* 464 F.3d 744, 758–59 (7th Cir. 2006) ("[S]uspicious timing alone does not support a reasonable inference of retaliation.  Indeed, the mere fact that one event preceded another does nothing to prove that the first event caused the second." (internal quotations, alterations, and citations omitted)).

Moreover, Ms. Hash's complaints of discrimination did not prevent Ms. Reynolds or the City from disciplining her when her conduct warranted disciplinary action.  *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1011 (7th Cir. 2000) (citing *Glover v. South Carolina Law Enforcement Div.,* 170 F.3d 411, 414 (4th Cir. 1999) ("Employees may not immunize improper behavior simply by filing a discrimination complaint.  Employers retain, as they always have, the right to discipline or terminate employees for any legitimate, nondiscriminatory reason." (alterations omitted))).  After her attorney's letter, Ms. Hash failed to appear at work on March 1, 2019.   Though Ms. Hash contends that Ms. Reynolds gave her verbal permission, she acknowledges that she did not follow ordinary protocols that required Ms. Reynolds to sign the form requesting time off.  [Filing No. 39-1 at 34.]

Finally, Ms. Hash's own testimony undercuts her claim that her attorney's letter was the cause of her termination.  She testified that she hired an attorney because she thought she was going to be fired.  [Filing No. 39-1 at 31.]  This testimony is consistent with Mr. Manus' statements that Ms. Hash's absence on March 1, 2019 was merely "the straw that broke the

back."  Simply put, Ms. Hash fails to present any evidence that shows that her attorney's letter was the cause of her termination.

The Court **GRANTS** Defendants' Motion for Summary Judgment on Ms. Hash's ADA retaliation claim.

### C.  FMLA Against the City

Defendants argue that they should be granted summary judgment on Ms. Hash's FMLA claim.  [Filing No. 38 at 28.]  They argue that "there is no evidence of a causal connection between [Ms. Hash's 2018] FMLA leave and her termination," and therefore her "claim fails under the direct method."  [Filing No. 38 at 29.]  Specifically, they note: (1) Ms. Hash acknowledged that she felt Ms. Reynolds was trying to get her terminated prior to her FMLA leave; (2) Ms. Hash was receiving poor performance reviews prior to her FMLA leave; (3) more than four months passed between the end of Ms. Hash's FMLA leave and her termination; (4) no one from the City contacted or tried to convince Ms. Hash to return to work during her FMLA leave and she was not required to perform any work that conflicted with her restrictions; (5) Mr. Manus did not do or say anything that led Ms. Hash to believe she was being discriminated against with respect to her FMLA leave; (6) Ms. Hash requested and received FMLA leave in 2015 with no consequences; (7) Ms. Hash was permitted to take personal calls and leave work early to care for her mother; and (8) Ms. Hash's work was deficient, but rather than being disciplined, a procedure was created to assist her.  [Filing No. 38 at 29.]  Additionally, they argue that Ms. Hash "could not have had the required reasonable, good faith belief that she was opposing unlawful activity" when her attorney sent the January 25, 2019 letter because of the facts articulated above.  [Filing No. 38 at 30.]  With respect to the indirect method, Defendants argue that Ms. Hash cannot show that she engaged in statutorily protected activity, that she was

meeting the City's legitimate expectations, or that she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. [Filing No. 38 at 30-31.]

Ms. Hash's Response with respect to her claim under the FMLA consists of a general overview of the FMLA, and her entire argument is contained in two short paragraphs:

> Incredibly, Defendants actually noted Plaintiff's prior FMLA leave to care for her mother in the September 25, 2017 write-up. In their depositions, Ms. Reynolds and Mr. Manus did not seem to have any problem with using a disciplinary notice to criticize Plaintiff for using her federally protected rights.

> Knowing Plaintiff had recently received FMLA leave, Defendants proceeded to fire Plaintiff. A reasonable jury could find this is retaliation for seeking FMLA leave.

[Filing No. 49 at 11.] Additionally, in a separate section centered on retaliation generally, Ms. Hash repeats the same arguments: "In the . . . write up, Ms. Reynolds disciplined Ms. Hash for an FMLA event. Ms. Reynolds writes: 'Missed a few days due to mother's illness.' Thus, Plaintiff was being disciplined for an FMLA event, although Ms. Reynolds readily admitted that she had no understanding of the FMLA or how to deal with an FMLA event. [Ms.] Reynolds admitted that she had no training on the FMLA." [Filing No. 49 at 14 (citations omitted).] Last, Ms. Hash argues that individual defendants are liable under the FMLA. [Filing No. 49 at 16.] She contends that Mr. Manus is liable under the FMLA because "he directed the write-ups of Ms. Hash and her termination." [Filing No. 49 at 16 (citations omitted).]

Defendants reply that whatever protected activity in which Ms. Hash purportedly engaged was not the but-for cause of her termination. [Filing No. 50 at 17.] They argue that she was granted FMLA leave when it was requested. [Filing No. 50 at 16.] They also argue that while she was on FMLA leave, "numerous errors with her work were discovered and rather than being disciplined upon her return, she merely had to sign a written procedure for how to perform [tasks] correctly and was counseled to better do her job going forward." [Filing No. 50 at 16.]

31

Last, they argue that to the extent Ms. Hash relies on her attorney's January 25, 2019 letter as her protected activity, she did not have a reasonable, good faith belief that she was opposing unlawful conduct, and even if she did have such a belief, she testified that she had her attorney send the letter "because she already suspected she'd soon be fired," which shows that the letter itself could not be the but for cause of her termination.  [Filing No. 50 at 17.]

Like the ADEA retaliation claim, the singular question in the FMLA context is "whether the record contains sufficient evidence to permit a reasonable factfinder to conclude" that Defendants fired Ms. Hash in retaliation for taking FMLA leave.  *Mourning v. Ternes Packaging, Ind.*, 868 F.3d 568, 571-72 (7th Cir. 2017).

Ms. Hash's arguments concerning her FMLA claim are meritless.  As mentioned above, she sets forth only two paragraphs of argument focused on the issue.  The first paragraph of argument is misleading, if not entirely false.  The write-up referenced in that paragraph states that Ms. Hash "missed a few days due to mother['s] illness."  [Filing No. 39-8 at 2.]  Though Ms. Hash included as exhibits documentation for FMLA leave in 2015 to provide care for her father, [Filing No. 49-1 at 71], and in 2018 related to her hip surgery, [Filing No. 49-1 at 100], she testified that she did not use her FMLA leave in 2015 and that "[t]he only FMLA I had, I believe that I actually took is when I fell and broke my hip."  [Filing No. 39-1 at 5.]  Ms. Reynolds also testified that she did not think Ms. Hash used FMLA leave in 2017.  [Filing No. 39-2 at 9-10 (Ms. Reynolds testifying that Ms. Hash taking three days off, as referenced in the write-up, "was not an FMLA event" and Ms. Hash "had not filed for FMLA during that period of time")).][7]

---

[7] The Court notes that Mr. Manus testified that Ms. Hash used FMLA leave to care for her mother.  [Filing No. 49-1 at 227 (Q: She had taken FMLA leave to care for her mother? A: Yes.").]  However, given that Ms. Hash does not cite to that portion of Mr. Manus' testimony in support of her argument, that Ms. Hash herself testified that she did not take FMLA leave to care for her mother, and that Ms. Hash fails to produce any other evidence of FMLA leave in 2017,

Therefore, it is at least inaccurate - if not misleading -  to claim that "Defendants actually noted Plaintiff's prior FMLA leave to care for her mother," and it is hyperbolic to assert that Ms. Reynolds and Ms. Manus "did not seem to have a problem using a disciplinary notice to criticize Plaintiff for using her federally protected rights."[8]  [Filing No. 49 at 11.]

Ms. Hash's second paragraph is a vague, bare assertion and contains no citations to the record.  As cited by the Court above and as also noted by Ms. Hash in her response brief, "[f]ailure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment." [Filing No. 49 at 4-5 (citing Fed. R. Civ. P. 56(e)).]  In sum, Ms. Hash was granted FMLA leave each time she requested it, [Filing No. 39-1 at 6; Filing No. 39-1 at 24], and she returned to work on both occasions.  Ms. Hash offers no evidence in support of her claim that Defendants fired her because she had recently received FMLA leave.  Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment on Ms. Hash's FMLA claim.

### D. ADA Claim Against the City

#### 1. Discrimination

Defendants argue that they should be granted summary judgment on Ms. Hash's disability discrimination claim and disability retaliation claim against the City.  [Filing No. 38 at 31-33.] With respect to her disability discrimination claim, Defendants argue that Ms. Hash's "claimed disability was her broken hip, and as of December 2018 (approximately 3 months prior to her termination) she was fully recovered with absolutely no restrictions or impacts to her abilities.

---

Mr. Manus' one word response to a leading question does not provide a sufficient basis for her arguments.

[8] The falsities were not accidentally included.  Ms. Hash's counsel made the same arguments later in the brief, stating "Ms. Reynolds disciplined Ms. Hash for an FMLA event," and "Plaintiff was being disciplined for an FMLA event."  [Filing No. 49 at 14.]

Therefore, she was not disabled, nor could her disability have served as [the] 'but-for' basis for her termination as is required."  [Filing No. 38 at 32.]

Ms. Hash responds that after suffering a broken hip, she was disabled as defined by the ADA.  [Filing No. 49 at 8.]  After reciting the various standards and methods of proof for ADA discrimination claims, Ms. Hash offers one paragraph of argument in support of her ADA discrimination claim:

> [Ms.] Reynolds' treatment of Ms. Hash displays a clear discriminatory animus. Calling Ms. Hash after surgery and insisting that Ms. Hash return to work immediately is discrimination.  Asking Ms. Hash to go to the post office while Ms. Hash was using a walker is illegal under the ADA.  Defendants then terminated Ms. Hash after she complained of these illegal acts.  A jury should decide if Defendants are liable to Ms. Hash under the ADA.

[Filing No. 49 at 10 (citations omitted).]

Defendants reply that Ms. Hash fails to address the fact that she was not disabled—and had not been disabled for months—at the time of her termination.  [Filing No. 50 at 13.] Defendants dispute Ms. Hash's characterization of the phone call following Ms. Hash's hip procedure and argue that Ms. Hash's own testimony makes clear that Ms. Reynolds did not demand that she return to work and that Ms. Reynolds did not contact her again during her approved leave.  [Filing No. 50 at 14.]  Defendants also argue that the post office request was an "innocuous conversation," and that when Ms. Hash objected to going to the post office, Ms. Reynolds admitted her mistake and went to the post office herself.  [Filing No. 50 at 14.]

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  "The ADA then defines 'discriminate against a qualified individual on the basis of disability' to include disparate treatment *and* failure to

accommodate: 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee.'" *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (quoting 42 U.S.C. § 12112(b)(5)(A)). A claim for *disparate treatment* based on disability "under the ADA requires proof that: (1) the plaintiff was disabled; (2) the plaintiff was otherwise qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the 'but for' cause of the adverse employment action." *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020) (citing *Scheidler* 914 F.3d at 541). "A claim for *failure to accommodate* under the ADA . . . requires proof (1) plaintiff was a qualified individual with a disability; (2) defendant was aware of [her] disability; and (3) defendant failed to accommodate [her] disability reasonably." *Scheidler* 914 F.3d at 541.

Ms. Hash is "entitled to seek the *McDonnell Douglas* burden shifting framework," or to pursue the "*Ortiz* approach of 'whether the evidence [considered as a whole] would permit a reasonable factfinder to conclude'" that the City terminated Ms. Hash because of her disability. *Castetter*, 953 F.3d at 997 (quoting *Ortiz*, 834 F.3d at 765).

The Court notes that again here, Ms. Hash's counsel grossly misrepresents the facts and evidence. Ms. Hash's counsel argues that "[c]alling Ms. Hash immediately after surgery and insisting that Ms. Hash return to work immediately is discrimination." [Filing No. 49 at 10.] However, Ms. Hash testified that Ms. Reynolds did not say she needed to return to work. [Filing No. 39-1 at 25 (Ms. Hash testifying about the phone call shortly after her surgery, "Q: Did Ms. Reynolds say that you needed to return to work? A: No, she didn't say that.").] Yet again, counsel's hyperbole and misrepresentations are not only unhelpful, but border on unethical.

Turning to the ADA discrimination claim itself, it is not clear whether Ms. Hash intends to pursue a disparate treatment claim, failure to accommodate claim, or both.  To the extent Ms. Hash intends to pursue a disparate treatment claim, she fails to present evidence that would permit a reasonable fact finder to determine that she was disabled at the time of her termination. *Winsley v. Cook Cty.*, 563 F.3d 598, 603 (7th Cir. 2009) ("The ADA defines a disability as 'a physical or mental impairment that substantially limits one or more major life activities.'" (quoting 42 U.S.C. § 12102(2))); *Bay v. Cassens Transport Co.*, 212 F.3d 969, 974 (7th Cir. 2000) ("Whether or not an individual meets the definition of a qualified individual with a disability is to be determined as of the time the employment decision was made.").  Even if she was disabled at the time of her termination, she has not presented evidence that would permit a factfinder to determine that her employment was terminated because of her disability.  Though Ms. Hash was temporarily disabled because of her hip, [Filing No. 39-1 at 35], she had not been disabled for several months at the time of her termination, [Filing No. 39-16].  She had in fact been released to work without restriction on December 28, 2018.  [Filing No. 39-16.]  Other than the bare facts that Ms. Hash was disabled at one point and months later terminated, she fails to present any evidence connecting her disability to her termination.  Moreover, she does not cite to any similarly situated comparators that were treated more favorably.

To the extent Ms. Hash intends to pursue a failure to accommodate claim, that claim appears to be based solely on the post office incident.  However, considering the evidence as a whole, the post office incident is not evidence of a failure to accommodate or otherwise discriminate on the basis of her disability.  It is undisputed that at the time Ms. Reynolds requested that Ms. Hash go to the post office, she was not under any restrictions.  [Filing No. 39-15.]   Additionally, Ms. Reynolds testified that the post office had a ramp in the back, meaning

36

Ms. Hash did not even need to go up the stairs.  [Filing No. 39-2 at 18.]  Nevertheless, after Ms. Hash objected to going to the post office, Ms. Reynolds went instead, and did not ask Ms. Hash to go to the post office or use stairs again.  [Filing No. 39-1 at 26.]  In sum, Ms. Reynolds did not ask Ms. Hash to perform any tasks that her medical providers had restricted her from doing at the time and did not in fact require her to perform the task about which Ms. Hash complains.  Ms. Reynolds has not presented any evidence showing that Defendants knew of her disability but failed to accommodate her disability.  Therefore, summary judgment is appropriate, and the Court **GRANTS** Defendants' Motion for Summary Judgment on Ms. Hash's ADA discrimination claim.

### 2.  *Retaliation*

Defendants argue that she cannot show that she was engaged in statutorily protected activity or that there was a causal link between any alleged protected expression and her termination.  [Filing No. 38 at 33.]  They argue that she did not have a "good faith reasonable and sincere belief that she was opposing unlawful discrimination on the basis of disability" when she engaged in the alleged protected activity—the January 25, 2019 letter—because she was not disabled at the time of the letter, her HR complaint on January 9, 2019 did not mention discrimination on the basis of a disability, and several of the instances complained of in the letter occurred prior to her disability.  [Filing No. 38 at 34.]  Moreover, they argue, those instances referenced in the letter that might be related to her disability—Ms. Reynolds' phone call the day after surgery and Ms. Reynolds asking Ms. Hash to go to the post office—are "innocuous conversations between a supervisor and subordinate employee" that do not amount to disability discrimination.  [Filing No. 38 at 34.]

Ms. Hash responds that the City retaliated against her because she complained to the City's Human Resources department that she was being mistreated and because of the January 25, 2019 letter from her attorney.  [Filing No. 49 at 12.]

Defendants reply that the January 25, 2019 letter was not statutorily protected activity because Ms. Hash "did not have a reasonable or good faith belief she was opposing discrimination on the basis of disability, as she had not been considered disabled for at least two months," at the time of the letter, and because the alleged discriminatory statements were "innocuous, appropriate conversations between a supervisor accommodating an injured employee with respect to her job duties and FMLA leave." [Filing No. 50 at 15.]

Under the ADA, "[e]mployers are forbidden from retaliating against employees who raise ADA claims regardless of whether the initial claims of discrimination are meritless. To prove a retaliation claim, a plaintiff must prove '(1) [s]he engaged in a statutorily protected activity; (2) [s]he suffered an adverse action; and (3) a causal connection between the two.'" *Koty v. DuPage Cty.*, 900 F.3d 515, 519 (7th Cir. 2018) (quoting *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011)).   As with her ADEA claim, Ms. Hash can use the *McDonnell Douglas* and *Ortiz* frameworks in the ADA retaliation context. *Rowlands v. United Parcel Service – Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018).

Ms. Hash's retaliation claim faces the same obstacles as her other retaliation claims: the unreasonableness of her belief that she was opposing unlawful conduct, her lack of evidence regarding pretext, and her lack of evidence of causation.  Her January 9, 2019 letter did not mention disability discrimination, and is therefore insufficient. *Tomanovich*, 457 F.3d at 663. Likewise, at the time of her attorney's letter, she did not have a reasonable belief that she was being discriminated against on the basis of her disability.  As noted above, when Ms. Reynolds

asked Ms. Hash to go to the post office, Ms. Hash had returned to work without a stairs-related restriction, and the post office had a handicap ramp.  And, in any event, Ms. Reynolds did not ultimately require Ms. Hash to go to the post office, nor did Ms. Reynolds punish or reprimand Ms. Hash for not going to the post office.  Additionally, Ms. Hash's testimony that Ms. Reynolds "would ask me how my hip was doing and not nicely.  Are you having any trouble with your hip still?  Is it hurting?," [Filing No. 39-1 at 31], is not sufficient for Ms. Hash to develop a reasonable belief that she was being discriminated against on the basis of her disability.

In any event, Ms. Hash has not presented any evidence that the City's nondiscriminatory reason(s) for her termination was pretextual.  Ms. Hash also fails to offer any evidence of a causal connection between her purportedly protected conduct and her termination other than temporal proximity, which is insufficient. *See Silk*, 795 F.3d at 710.

Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment on Ms. Hash's ADA retaliation claim.

### E.  ERISA

Defendants argue that they are entitled to summary judgment on Ms. Hash's ERISA claim "[b]ecause [Ms. Hash] is a public employee and her pension plan is a governmental plan, [so] ERISA does not create a cause of action for [her]."  [Filing No. 38 at 35.]

Ms. Hash agrees that the ERISA claim should be dismissed.

Based on Ms. Hash's concession, the Court **GRANTS** Defendants' Motion for Summary Judgment on Ms. Hash's ERISA claim.

### IV.
### CONCLUSION

The Seventh Circuit Court of Appeals has explained that summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would

convince a trier of fact to accept its version of events." *Schact v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999).  Ms. Hash clearly believes that she was unfairly discriminated against. But "this court does not act as a superpersonnel department." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017) (internal quotation omitted).  "Rather, the only question is whether the employer's proffered reason [for the adverse employment action] was pretextual, meaning that it was a lie." *Coleman v. Donahue*, 667 F.3d 835, 852 (7th Cir. 2012).  Aside from her subjective assessment of her work, Ms. Hash fails to provide any evidence which suggests that her age, use of FMLA leave, or disability had anything to do with her termination discipline or which undermines Defendants' proffered explanations for her termination.  Therefore, Defendants' Motion for Summary Judgment, [37], is **GRANTED**.  Final Judgment shall enter accordingly.

Date: 9/29/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record.**